UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 16-21368-CIV-WILLIAMS/SIMONTON

RON GOINS,

    Plaintiff,

v.

ROYAL CARIBBEAN CRUISES, LTD.,

    Defendant.

_____/

### PLAINTIFF'S RESPONSE TO DEFENDANT'S DAUBERT MOTION TO STRIKE TESTIMONY OF MARK YOUNG

Plaintiff, RON GOINS ("Mr. Goins"), by and through his undersigned counsel, hereby responds to Defendant's, ROYAL CARIBBEAN CRUISES, LTD., Motion to Strike Testimony of Plaintiff's Expert, Mark Young ("Mr. Young").

**I.  BACKGROUND**.

This is a maritime personal injury action in which Defendant owed its passengers a duty of reasonable care under the circumstances, including a duty to enforce its own safety rules. However, Defendant breached this duty, which caused a cruise ship passenger, Mr. Goins, to trip, stumble, and fall down Defendant's stairs while playing the Quest game when his flip-flop sandal caught an armrest of a chair at the front side of the end of his seating row. Participants were not supposed to run, scurry, or otherwise move quickly, and Defendant's failure to enforce these rules turned the Quest game into a race by participants to reach the stage first. Furthermore, Defendant hosted the Quest game in Studio B, an ice arena which was not a reasonably safe venue to host the game, as its stairs and handrails had structural deficiencies that made them unsafe, and Mr. Goins' seating row lacked adequate legroom for activities like the Quest game.

This race-like, hurried atmosphere, in addition to Studio B's inadequacies, created an environment which was unreasonably dangerous for passengers. Furthermore, Defendant did not have a rule prohibiting passengers from wearing sandals, or other open-toe footwear, even though they knew this footwear was dangerous for passengers to wear during the Quest game. These failures to use reasonable care under the circumstances constituted negligence in-and-of themselves, but they also constituted negligence in combination with each other as well.

If Defendant had enforced its safety rules, this race-like hurried atmosphere would not have been present, and Mr. Goins would not have thought it was appropriate to hurry. However, because Defendant failed to enforce these safety rules, Mr. Goins tripped and fell down Defendant's stairway to the stage, causing him severe shoulder injuries, pain and suffering.

## II.     LEGAL STANDARD AND ANALYSIS.

### A.     The *Daubert* Standard.

The *Daubert* standard for the admissibility of expert testimony replaced the previous "general acceptance" standard articulated in *Frye v. United States*, 293 F. 1013 (1923), and it is a rule more liberal towards the admissibility of expert testimony than its predecessor. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588–89 (1993). As the Supreme Court has made clear,

> [t]he drafting history makes no mention of *Frye*, and a rigid "general acceptance" requirement would be at odds with the "liberal thrust" of the Federal Rules and their "**general approach of relaxing the traditional barriers to 'opinion' testimony.**" *Beech Aircraft Corp. v. Rainey*, 488 U.S., at 169, 109 S.Ct., at 450 (citing Rules 701 to 705). *See also Weinstein, Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended*, 138 F.R.D. 631 (1991) ("The Rules were designed to depend primarily upon lawyer-adversaries and sensible triers of fact to evaluate conflicts"). Given the Rules' **permissive backdrop** and their inclusion of a specific rule on expert testimony that does not mention "'general acceptance,'" the assertion that the Rules somehow assimilated *Frye* is unconvincing. *Frye* made "general acceptance" the exclusive test for admitting expert scientific testimony. That austere standard, absent from, and incompatible with, the Federal Rules of Evidence, should not be applied in federal trials.

*Daubert*, 509 U.S. at 588–89.

In this regard, the standard under *Daubert* is to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.* at 589. When faced with a proffer of expert evidence, a trial court must determine at the outset pursuant to Fed. R. Evid. 104(a) whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. *Quiet Technology DC-8, Inc., v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003) (citing *Daubert*, 509 U.S. at 592-93)). In doing so, courts look to Fed. R. Evid. 702, which provides, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702.

Determining the admissibility of expert testimony under Fed. R. Evid. 702 requires a three-part inquiry. *U.S. v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). Trial courts must consider whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*, and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *Frazier*, 387 F.3d at 1260; *see also United States v. Burchfield*, 719 F.2d 356 (11th Cir.1983) (explaining that expert testimony is admissible where it is "the kind that enlightens and informs lay persons without expertise in a specialized field.").

While the Daubert Court identified four factors to guide district judges in assessing reliability of an expert's methodology, "[t]he rules relating to *Daubert* issues are not precisely calibrated and must be applied in case-specific evidentiary circumstances that often defy

3
**ARONFELD TRIAL LAWYERS**
www.Aronfeld.com

generalization." *U.S. v. Ala. Power Co.*, 730 F.3d 1278, 1285 (11th Cir. 2013).[1] In addition, "'the Court has emphasized that these factors are not exhaustive and are intended to be applied in a 'flexible' manner.'" *Tampa Bay Water v. HDR Eng'g, Inc.*, 731 F.3d 1171, 1184 (11th Cir. 2013) (quoting *United Fire & Cas. Co. v. Whirlpool Corp.*, 704 F.3d 1338, 1341 (11th Cir.2013)). "Thus, for example, the absence of publications on a given methodology does not mean that an expert's testimony based on that methodology is inadmissible." *Tampa Bay Water*, 731 F.3d at 1184.

The court is the gatekeeper to the admission of scientific testimony. *Id.* at 589. The *Daubert* standard is also applicable when the court is presented with a proffer of expert technical or other specialized testimony. *Kumho Tire Co., Ltd., v. Carmichael*, 526 U.S. 137, 147 (1999). Reliability, and thus admissibility, must be shown by a preponderance of the evidence. *Hall v. United Ins. Co. of Am.*, 367 F.3d 1255, 1261 (11th Cir. 2004); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999) (citation omitted). Furthermore, experts may rely solely or primarily on experience, if when they do so, they can "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Frazier,* 387 F.3d at 1261.

Furthermore, if this Honorable Court has doubts regarding the basis of Mr. Goins' experts' opinions, the best practice is for the Court to hold a *Daubert* hearing. As the court in *United States v. DSD Shipping, A.S.*, 2015 WL 5737157 (S.D. Ala. Sept. 30, 2015) succinctly summarized when discussing *United States v. Frazier*, 387 F.3d 1244 (11th Cir. 2004),

> "First, the district court in Frazier excluded portions of the expert's testimony **after conducting a Daubert hearing**. The instant matter is before the Court on Defendants' Rule 16 motion and not after a *Daubert* hearing. Second, the central issue in Frazier revolved around the expert's reliability. '*Frazier*['s] [expert] **was afforded every opportunity at the hearing** to adduce the foundations of [his] challenged opinion' through direct and cross-examination. *Id.* at 1264. At this point, the [other party] **has not had 'every opportunity' to provide a foundation** for its expert's opinion **through a Daubert hearing** to establish reliability."

---

[1] These factors are (1) whether the expert's theory has been subjected to peer review; (2) whether the theory has been subjected to publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community. *Daubert*, 509 U.S. at 593-94.

*DSD Shipping*, 2015 WL 5737157, at *3 (emphasis added) (citing *Frazier*, 387 F.3d at 1260).

Furthermore, as the Advisory Committee Notes on the 2000 Amendments to Fed. R. Evid. 702 show, Rule 702, as amended,

> is not intended to provide an excuse for an automatic challenge to the testimony of every expert. *See Kumho Tire Co. v. Carmichael*, 119 S.Ct.1167, 1176 (1999) ([T]he trial judge has the discretion "both to avoid unnecessary 'reliability' proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted, and to require **appropriate proceedings** in the less usual or more complex cases **where cause for questioning the expert's reliability arises**.")

Fed. R. Evid. 702 (Advisory Committee Notes on 2000 Amendments) (emphasis added).

Finally,

> A review of the caselaw after *Daubert* shows that the rejection of expert testimony **is the exception rather than the rule**. *Daubert* did not work a "seachange over federal evidence law," and "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." *United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi*, 80 F.3d 1074, 1078 (5th Cir. 1996). As the Court in Daubert stated: "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. at 595.

Fed. R. Evid. 702 (Advisory Committee Notes on 2000 Amendments) (emphasis added).

    **B.**    **Mr. Young Meets the *Daubert* 3-part Inquiry**.

    **1.**    **Expert Qualifications**.

The first part of the Frazier test for determining admissibility of expert testimony under Fed. R. Evid. 702 is whether the expert is qualified to testify competently regarding the matters he intends to address. *Frazier*, 387 F.3d at 1260. Under FED. R. EVID. 702, a witness may be qualified as an expert by virtue of his or her "knowledge, skill, experience, training, or education." *Quiet Tech. DC-8, Inc.*, 326 F.3d at 1342. "This inquiry is 'not stringent,' and 'so long as the expert is **minimally qualified**, objections to the level of the expert's expertise [go] to credibility and weight, not admissibility.'" *Clena Investments, Inc. v. XL Specialty Ins. Co.*, 280 F.R.D. 653, 661 (S.D. Fla. 2012) (emphasis added) (quoting Vision I Homeowners Ass'n, Inc. v.

Aspen Specialty Ins. Co., 674 F.Supp.2d 1321, 1325 (S.D.Fla.2009)); *see also Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 809 (3d Cir. 1997), as amended (Dec. 12, 1997) ("If the expert meets liberal minimum qualifications, then the level of the expert's expertise goes to credibility and weight, not admissibility").

Here, Mr. Young is "an architectural and civil engineer by degree, and [he] [is] a practicing city engineer for the City of Morganton, North Carolina. [His] background is very varied and goes across all disciplines of transportation." *See* Deposition of Mark Young ("Young Depo"), attached hereto as exhibit 1, at 35:23-36:11; *see also* Expert Report and CV of Mark Young ("Young Report"), attached hereto as exhibit 2, at pp. 7-23. As to Mr. Young's education in civil, architectural, biomechanical, and human factors engineering, Mr. Young's "initial background is in architectural and civil engineering, so all the bases in terms of math, science, physics, statics, and that comes from the -- my education as an architectural and civil engineer. [His] -- Those are [his] bachelor degrees. [His] master's work has been in **biomechanics**, **human factors**, and occupational safety." *See* Young Depo, exhibit 1, at 105:8-24 (emphasis added).

As to his training and experience with biomechanical engineering, Mr. Young testified that "I employ it when I look at issues even when I'm -- as a city engineering trying to design our structures, our facilities. I have to be cognizant of what -- what I am creating in terms of facilities for pedestrians, bicycle -- bicyclists, automobiles, any end user of the facilities or infrastructure that I'm putting in place in the City of Morganton." *See Id.* at 106:1-14. As to his training in human factors engineering, Mr. Young testified that "in addition to my master's work in that, I've attended for the last 20-plus years the human factors workshop as part of the transportation research board annual conference in Washington, DC. I also take other courses as continuing education to maintain my license as a professional engineer in North Carolina and Florida." *See Id.* at 106:15-107:12; *see also* Young Report, exhibit 2, at pp. 9-15, 20. As to his experience in applying human factors engineering, Mr. Young testified that "I employ it every day. You have

to. You have basically human factors, environmental factors, and if you're dealing with a roadway, vehicle factors. So all those have to be accounted for in any design that you are employing." *See* Young Depo, exhibit 1, at 107:13-20. Furthermore, Mr. Young has "testified in many cases using [his] human factors training and experience[,] . . . And [he has] never been stricken before for not -- being qualified to opine as a human factors expert[.]" *See Id.* at 107:21-108:7 ("Yes, I don't -- I don't believe I've ever been stricken.").

In the maritime context, Mr. Young has testified for Defendant "numerous times[ ]" in the past, and he has testified for the defendant in maritime cases more often than for the plaintiff. *See Id.* at 6:2-8, 111:9-23; *see also* Young Report, exhibit 2, at p. 23; *see also* Rule 26 List of Mark Young ("Young Case List"), attached hereto as exhibit 3. Contrary to Defendant's assertions, Mr. Young is qualified to testify to his opinions in this case, based on his knowledge, skill, education, training, and experience enumerated above. Defendant's allusions to Mr. Young reaching his conclusions before his investigation are therefore wholly unfounded.

In addition, although Defendant cites to a number of cases in support of its position, it is noteworthy that Defendants have not cited to a single case in which an expert with qualifications similar to Mr. Young was excluded under *Daubert*. *See, e.g., City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 563 (11th Cir. 1998) ("We conclude that the district court abused its discretion in excluding Garner's testimony and therefore reverse that ruling. We further conclude that the district court's interpretations of Daubert and of Rules 104 and 702, which formed the basis for the court's exclusion of the testimony of McClave, were erroneous as a matter of law."); *see also In re Stand "N Seal, Prod. Liab. Litig.*, 636 F. Supp. 2d 1333, 1337 (N.D. Ga. 2009) ("Pollack–Nelson's expert testimony should not be excluded. She is qualified to testify about the human factors involved in the manufacture and marketing of Stand 'n Seal. . . . While she was at the Consumer Product Safety Commission she provided assessments of how

product design, warnings, and instructions would influence consumer use, opinions of hazards based on product design, and trained investigators.").

In conclusion, Defendant's interpretation of the qualification prong of flies in the face of *Daubert*'s permissive application. Mr. Goins' reiterates that "[t]his inquiry is ''not stringent,' and 'so long as the expert is minimally qualified, objections to the level of the expert's expertise [go] to credibility and weight, not admissibility.'" *Clena Investments, Inc.*, 280 F.R.D. at 661 (quoting *Vision I Homeowners Ass'n, Inc*, 674 F.Supp.2d at 1325); *see also Kannankeril*, 128 F.3d at 809, as amended (Dec. 12, 1997) ("If the expert meets liberal minimum qualifications, then the level of the expert's expertise goes to credibility and weight, not admissibility").

> 2. **Mr. Young's Opinions Satisfy the Reliability Standard of *Daubert*, and Defendant's Arguments go to the Weight of his Testimony, not its Admissibility**.

The second part of the Frazier test for determining admissibility of expert testimony under Fed. R. Evid. 702 is whether the methodology by which the expert reaches his or her conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*. *Frazier*, 387 F.3d at 1260. In the instant case, Mr. Young's methodology is reliable under *Daubert*, and therefore exclusion is not appropriate.

> i. **The Methodology of Mr. Young**.

As to the methodology he employed in this case, Mr. Young testified that, "[b]efore [Mr. Young's] inspection of the vessel, [he] [ ] sp[oke] with Mr. Goins[.]" *See* Young Depo, exhibit 1, at 37:16-21. According to Mr. Young, Mr. Goins "told [him] how the points were given out. The team that got down there first got five points, the second team got four, and so on. The sixth team would get no points. So that is incentive in itself for teams to rush down to the stage if they want to try to accumulate points and win the event[,]" and that, although the rules of the game were that there was no running or rushing, "Royal Caribbean contradicts that by then giving incentives to the team that gets down there first getting the most points." *See Id.* at 49:23-50:23, 90:8-16

8

("it's instructing them not to rush. . . . But then they contradict that by giving the point incentives.").

During the vessel inspection, Mr. Young found that, whereas "[t]he Life Safety Code require[d] that there's a clear width of 12 inches[ ]" in Studio B, "with Rachel and Eric standing, even with the seatbacks up and due to the anthropometry of Mr. Goins, there would have been less than 9 inches, I believe, left for him to get through there." *See Id.* at 100:11-22. Furthermore, Mr. Young found that the Life Safety Code required that the height of the nosing on the stair "should be less than 3/16 of an inch[,]" but that the height of the nosing was "3/8." *See Id.* at 104:15-22. In addition, Mr. Young found that the handrails were not even, "because, again, they're a part of a telescoping or retractable set of seating. You do not even have consistent -- You do not even have consistency as far as the height above the leading edge of the tread and the -- also the reason for that is because there are unequal treads in this particular set of stairs." *See Id.* at 104:23-105:7.

Mr. Young, drawing from his knowledge, skill, education, training, and experience in civil, architectural, biomechanical, and human factors engineering reasoned as follows:

> Walking is in -- in and of itself is a controlled fall. When we are born, of course, we're not walking like other mammals. It takes us quite a while before we master the mechanics of this controlled fall. So the mechanics are it's -- you throw one of your legs forward, thereby moving your center of gravity forward, and then you use your back leg to come forward and then regain your balance.
> . . .
> His mechanics -- he -- were interrupted by the defects that were present on the steps, the unequal tread, the distance the way the handrail was, the disparity in the coefficients of friction between the row carpeting, the aisle carpeting, the temporary step carpeting, and then the -- the surface that was covering the ice.

*See Id.* at 100:23-101:25.

Mr. Young found that "[f]or all of the areas [he] just discussed, . . . the standards indicated in the Life Safety Code were not met[.]" *See Id.* at 102:1-18 ("That's correct."). Mr. Young found

**9**

that the Life Safety Code was a reasonable standard that Defendant should have ensured Studio B met prior to hosting the Quest game there, since

> [t]he Life Safety Code, its main purpose is to establish standards and guidelines for the safe and efficient movement of people out of an area of building, a structure during an emergency situation.
>
> . . .
>
> You want to save lives. So the quicker you can get people out of a structure that there's an emergency occurring, the more lives you save. And you want everything to be as consistent as possible between all the various types of buildings and structures.
>
> . . .
>
> Normally in an emergency, people tend to panic and they're going to try to **rush** to exit from the area they're in.
>
> . . .
>
> [Here,] participation in [the Quest] game [ ] gives incentives with scale -- scaling down points for getting down to the stage [faster].

*See Id.* at 102:19-104:14. Mr. Young "rel[ied] on [his] education, background, experience, and a reasonable degree of engineering probability and judgment[ ]" in forming his opinions. *See Id.* at 128:5-10.

After he inspected Studio B on the *Liberty of the Seas*, Mr. Goins took the deposition of Amanda Campos (Defendant's corporate representative), Defendant took the deposition of Mr. Goins, and Mr. Young reviewed these deposition transcripts. *See Id.* at 31:3-15. Prior to his deposition, Mr. Young also "reviewed all the materials that [he] underst[oo]d have been produced for discovery by both parties[,]" which included the "cruise [in] review video and then also the -- a video showing the rules presented to the Quest game participants[,]" and Mr. Young testified that, as far as he knew, none of those documents "contained any pertinent information that's not already contained within [his] report and within the materials that [he] ha[d]." *See Id.* at 31:16-34:8. When asked if his opinions in his December report changed since reviewing this material, Mr. Young testified that they had not, and "[i]n fact, they've been bolstered by the evidence that I have been able to review." *See Id.* at 53:1-6.

In its attack on Mr. Young's opinions, Defendant also relies heavily on the fact that the Life Safety Code is not legally binding on it. However, Mr. Young explained that the Life Safety Code is not legally binding on Defendant "[b]ecause Royal Caribbean use -- chooses to use a flag of convenience and registers their vehicle in the Bahamas[,] . . . that . . . is fact. That is well-known . . . knowledge among the maritime and transportation engineers." *See Id.* at 55:15-56:4; *see also Id.* at 58:6-20 ("Q. What governing body would govern architectural standards of the ship? A. There are none, conveniently[.]"); *see also Id.* at 59:13-21 ("Attempts have been made, the CFR, the Americans with Disabilities, architectural guidelines have attempted to try to regulate the maritime industry, but, again, because of their flag of convenience in the Bahamas, they are not US registered vehicles, so our US codes do not apply to them."). Furthermore, Mr. Young testified that "[a]ny design employed aboard a ship must be derived and based on land -- land-based design when you're talking about a -- an arena or stadium in this particular case because there is no precedent for ships having arenas or stadiums. So those designs have to be based on land-based structures." *See Id.* at 59:22-60:18. Furthermore, as Mr. Young testified, "there [is no] reason why the -- why a stadium on a ship would require . . . a less stringent standard than a stadium off a ship[.]" *See Id.* at 128:11-22.

As to the one prior case where Mr. Young's opinions were stricken, Defendant leaves out an incredibly important detail about why Mr. Young was stricken. In this prior case, the Court determined that "[h]is testimony would not even add the perspective of one who himself inspected the conditions that are the subject of this suit – **Mr. Young did not personally inspect the premises at all**." *Harrison v. Royal Caribbean Cruises, Ltd.*, WL 11316997, at *4 (S.D. Fla. Nov. 8, 2013). Considering that Mr. Young did not even inspect the premises in *Harrison*, it is not surprising that the *Harrison* court found that his opinions would not be helpful to the trial of fact. However, as discussed above, Mr. Young performed a ship inspection in Mr. Goins' case. Furthermore, unlike in the case at hand, the plaintiff in the *Harrison* case did not appear be

hurrying in a hurried environment. *Harrison v. Royal Caribbean Cruises, Ltd.*, 2013 WL 12101117, at *1 (S.D. Fla. Sept. 18, 2013). Therefore, the Life Safety Code's fire safety standards did not appear to "fit" the facts of the *Harrison* plaintiff's case the same way it fits the facts of Mr. Goins' case, where Mr. Goins was hurrying in a hurried environment.[2]

Furthermore, even if Mr. Young's opinions were "shaky," under *Daubert*, "'[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" Fed. R. Evid. 702 (Advisory Committee Notes on the 2000 Amendments) (quoting *Daubert*, 509 U.S. at 595). To the extent that Defendant disagrees with Mr. Young, the spirit of *Daubert* is to allow reliable theories to compete before a fact finder. In this regard, Fed. R. Evid. 702, as amended, "is broad enough to permit testimony that is the product of competing principles or methods in the same field of expertise." *See* Fed. R. Evid. 702 (Advisory Committee Notes on the 2000 Amendments) (citing *Heller v. Shaw Industries, Inc.*, 167 F.3d 146, 160 (3d Cir. 1999)).

Mr. Young has explained the methodology that he employed, namely speaking to the plaintiff, discovering that the Quest game involved rushing and/or hurrying as an important component of the game, performing a ship inspection, inspecting for (among other things) any structural deficiencies under a standard for safe movement of people in hurried environments such as that articulated in the Life Safety Code, determining that there were such deficiencies, and then determining if these deficiencies were causative factors. Mr. Young's investigation was straight-forward, and there is nothing novel or unreliable about how Mr. Young reached his conclusions. Therefore, Mr. Young's opinions satisfy *Daubert*, and they should not be stricken.

---

[2] As to *Whelan v. Royal Caribbean Cruises Ltd.*, 2013 WL 5595938, at *4 (S.D. Fla. Aug. 12, 2013), Mr. Goins **is** alleging that his injury resulted from Defendant's failure to conform to fire safety standards. As Mr. Young explained, fire safety standards are designed to facilitate the safe movement of people in hurried environments, which are exactly the kind of standards that, had Defendant followed them in Mr. Goins' case, the likelihood of his incident occurring would have been substantially reduced.

      ii.    **The Opinions of Mr. Young that Defendant is Challenging are not Impermissible Legal Conclusions**.

Next, Defendant argues that certain parts of Mr. Young's testimony are merely legal conclusions, and that therefore his testimony should be excluded. In this regard, "[a]lthough testifying experts may not offer legal conclusions, Federal Rule of Evidence 704(a) provides, in relevant part, that 'testimony in the form of an opinion or inference otherwise admissible is <u>not objectionable because it embraces an ultimate issue</u> to be decided by the trier of fact.' *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty., Fla.*, 402 F.3d 1092, 1112 n.8 (11th Cir. 2005) (citing Fed.R.Evid. 704(a)) (emphasis added); *see also United States v. Milton*, 555 F.2d 1198, 1203 (5th Cir. 1977) ("Rule 704 abolishes the per se rule against testimony regarding ultimate issues of fact. By the same token, however, courts must remain vigilant against the admission of legal conclusions, and an expert witness may not substitute for the court in charging the jury regarding the applicable law.").

Defendant fails to demonstrate why merely using legal terms makes these opinions of Mr. Young impermissible legal conclusions, nor is it clear why these proffered opinions of Mr. Young are not, in fact, admissible under Rule 704's protection of opinions that embrace an ultimate issue. However, to the extent that Mr. Young's testimony may contain matters that Defendant objects to under the Federal Rules of Evidence, Defendant is certainly free to raise such objections during motions *in Limine* (or by objection at trial), and if Defendant's objections are valid, Mr. Young's testimony can be redacted or limited as appropriate when the time comes for the Court to rule on them. However, the present matter before the Court is a *Daubert* challenge to Mr. Young's expert testimony in this case.

Therefore, since Mr. Young may testify to ultimate issues of fact, his testimony is proper and should not be stricken under Federal Rule of Evidence 704. However, if this Honorable Court believes that a *Daubert* motion is the proper avenue to make this challenge and finds that it

is improper for Mr. Young to use the term "negligent" when describing Defendant's behavior, Mr. Goins' respectfully submits that Mr. Young can testify, without using the word "negligent," that Studio B failed to conform to the Life Safety Code and that Studio B was not a suitable venue to host the Quest game in because of this, and his entire testimony should not be stricken.

    3.    **Expert Testimony Is <u>Helpful</u> to the Trier of Fact (Necessity is not the Standard)**.

The third part of the *Frazier* test for determining admissibility of expert testimony under Fed. R. Evid. 702 is whether the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *Frazier*, 387 F.3d at 1260. By this requirement, expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person. *Id*. at 1262. Thus, "[e]xpert testimony is properly excluded when it is not needed to clarify facts and issues of common understanding which jurors are able to comprehend for themselves." *Evans v. Mathis Funeral Home, Inc.*, 996 F.2d 266 (11th Cir. 1993). Here, the testimony Mr. Young wishes to offer is certainly "the kind that enlightens and informs lay persons without expertise in a specialized field." *United States v. Burchfield,* 719 F.2d 356, 357 (11th Cir. 1983).

Defendant argues that the structural defects Mr. Young found regarding the stairs, the treads, and the nosing were not causative factors of Mr. Goins' incident. However, as Mr. Young clarified during his deposition, "[w]hen Mr. Goins' flip-flop caught the chair at the end of the row, he had not come to final rest yet[,]" as "[h]e had just initiated the fall. You're at the very . . . initial stage of what would be term -- would be termed the trip-and-fall. The fall doesn't end until he comes to a final rest position, and his final rest position was on the covering on the ice rink." *See* Young Depo, exhibit 1, at 120:15-121:1. In this regard, Mr. Young testified that these structural defects "did contribute to his trip-and-fall though. It did not cause the -- It was not the initiating event. . . . It was not the cause of his trip, but it was the cause of the continuation of the fall all the way to the ice rink." *See Id.* at 84:3-14. Mr. Young was very clear that these structural

defects were causative factors of Mr. Goins' incident, since they are part of "what ultimately lead[ ] to his injury." *See Id.* at 98:14-23.

Although Defendant argues that there is no allegation in the Complaint that the stairs were unreasonably dangerous or caused Plaintiff's fall, this is simply not true. If nothing else, "one of plaintiff's allegations in his complaint was that defendant breached [its] duty of care in other manners that will be revealed through discovery[,]" and Mr. Young "agree[d] that -- that the dangers that [he] identified in [his] initial report were other [such] ma[nn]ers revealed in discovery[.]" *See Id.* at 123:3-15 ("I -- I believe I recall that stated, yes. . . . Correct."); *see also* Plaintiff's Third Amended Complaint, [DE 28], at p. 3, ¶ 12(s) ("Through other acts or omissions constituting a breach of the duty to use reasonable care which will be revealed through discovery[.]"); *see also, e.g., Id.* at p. 3, ¶ 12(b) ("Failing to take proper precautions for the safety of passengers traversing through its seats, **stairs**, floors, walkways, or thresholds[.]") (emphasis added); *see also Id.* at p. 3, ¶ 12(c)-p. 4, ¶ 12(j).

Defendant's argument that Mr. Goins cannot prove a negligent design theory also does not render the issue of these structural deficiencies irrelevant. Defendant, as "the occupier of a ship[ ] 'owes certain duties of care to a business invitee, . . . including the duty not to cause injury by negligent activity, the duty to warn of latent perils actually known to the occupier, and the duty to **inspect the premises to discover dangerous conditions**.") *See Fed. Marine Terminals, Inc. v. Burnside Shipping Co.*, 394 U.S. 404, 417 (1969) (emphasis added) (citations omitted). Mr. Goins was a business invitee and a lawfully paying passenger aboard Defendant's commercial cruise ship, the *Enchantment of the Seas*. Whether Defendant participated in the design of studio B or not, Defendant breached its duty of reasonable care to Mr. Goins and created a dangerous condition by either failing to adequately inspect Studio B for dangers (structural and otherwise), prior to hosting the Quest game in it, or by failing to eliminate these dangers if it did know about them. Therefore, the deficiencies found by Mr. Young are relevant regardless of whether Mr.

Goins can prove a negligent design theory, and Mr. Young's testimony as to these deficiencies will be helpful to the trier of fact, and should not be excluded.

### III. CONCLUSION.

Therefore, for all the foregoing reasons, Plaintiff, RON GOINS, submits that Defendant's *Daubert* Motion to Strike the Testimony of his Expert, Mark Young, should be denied. In the alternative, Mr. Goins requests that judgment on Defendant's motion be reserved until a *Daubert* hearing can be held where any of the Court's concerns as to the basis of Mr. Young's opinions can be addressed in depth, since Mr. Goins respectfully submits that "excluding an expert's opinion . . . goes too far at this point." *DSD Shipping*, 2015 WL 5737157, at *3 (emphasis added) (citing *Frazier*, 387 F.3d at 1260).

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 5, 2017, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I ALSO CERTIFY that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to electronically receive Notices of Electronic Filing.

    Respectfully submitted,
    ARONFELD TRIAL LAWYERS
    3132 Ponce de Leon Blvd.
    Coral Gables, Florida 33134
    Tel:    (305) 441 - 0440
    Fax:   (305) 441 – 0198
    Attorneys for Plaintiffs

  By: /s/ Matthias M. Hayashi, Esq.
     Matthias M. Hayashi
     Florida Bar Number: 115973
     mhayashi@aronfeld.com

**SERVICE LIST**

Jeffrey Eric Foreman
Foreman Friedman, PA
2 S Biscayne Boulevard, Suite 2300
Miami, FL 33131-1803
305-358-6555
Fax: 305-374-9077
Email: jforeman@fflegal.com

Amanda Jean Sharkey Ross
Foreman Friedman PA
2 South Biscayne Blvd.
Miami, FL 33131
305-358-6555
Fax: 305-374-9077
Email: aross@fflegal.com

Karen Foy Grossman
Foreman Friedman, P.A.
2 S Biscayne Boulevard
Miami, FL 33131-1803
305-358-6555
kgrossman@fflegal.com

Rachael Mitchell Fagenson
Foreman Friedman, P.A.
2 South Biscayne Blvd., Suite 2300
Miami, FL 33130
(305) 358-6555
rmitchell@fflegal.com

Elisha Sullivan
Foreman Friedman, PA
2 South Biscayne Boulevard, Suite 2300
Miami, FL 33131
(305) 358-6555
esullivan@fflegal.com

Darren Wayne Friedman
Foreman Friedman, PA
2 S Biscayne Boulevard
Miami, FL 33131
305-358-6555
374-9077 (fax)
dfriedman@fflegal.com